**ORDERED.**

Dated: April 24, 2024

_____
Jason A. Burgess
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

Trevan Anthony Crawford,

        Debtor.
_____/

Case No. 3:23-bk-02263-BAJ
Chapter 13

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This Case came before the Court for trial on February 28, 2024 on the *Objections to Confirmation* (Doc. Nos. 16, 83), the *Amended Objection to Exemptions* (Doc. No. 40), the *Response to Amended Objection to Exemptions* (Doc. No. 46), the *Motion to Avoid Judgment Lien of Natasha Crawford* (Doc. No. 48), the *Response to Motion to Avoid Lien* (Doc. No. 63), the *Objection to Claim No. 17-3 of Natasha Crawford* (Doc. No. 61), the *Response to Objection to Claim 17-3* (Doc. No. 72), and the *Motion to Dismiss Chapter 13 Case* (Doc. No. 79). At the conclusion of the trial, the Court took the matters under advisement and directed the parties to submit post-trial briefs (Doc. Nos. 104-05).

Trevan Crawford (the "Debtor") seeks confirmation of his Chapter 13 plan. The Debtor's former spouse, Natasha Crawford ("Claimant"), seeks dismissal of the case for bad faith. Alternatively, the Claimant, who filed Claim 17 (the "Claim"), seeks disallowance of the

Debtor's homestead exemption and allowance of her equitable subordination awarded as a secured, priority claim. The majority of the Claim stems from an award of equitable distribution by the State Court included in the Amended Final Judgment of Dissolution of Marriage. The State Court made extensive findings in the underlying divorce proceeding regarding the equitable distribution. This Court is bound by those findings. This includes *numerous* findings by the State Court of dishonest and misleading conduct by the Debtor. Perhaps, without other indicia of bad faith, the Debtor's pre-petition conduct would not justify dismissal. However, the Debtor's failures in this Case, combined with past misconduct, demonstrate a pattern of behavior that warrants dismissal of this Case. Accordingly, the Court will grant the Motion to Dismiss.[1]

### Findings of Fact

The Debtor and the Claimant, share two minor children and were married from March 6, 2013, until entry of a final judgment of dissolution of marriage on May 27, 2020.[2] Prior to the dissolution, the parties lived together as a family in their home located at 9669 Waterloo Place, Jacksonville, FL 32221 (the "Waterloo Property") from 2014 to 2018.

On December 2, 2015, the Debtor acquired sole title to real property located at 1479 Rose Hill Drive E., Jacksonville, FL 32221 (the "Rose Hill Property"). On July 24, 2018, the Debtor was arrested following a domestic incident between the parties. Due to the incident, the Claimant successfully obtained a domestic violence injunction (the "Injunction"), which required the Debtor to remain away from the Waterloo Property until August 8, 2019.

On August 1, 2018, the Debtor quitclaimed the unencumbered Rose Hill Property to his sisters. Barely two weeks later, the Debtor initiated dissolution proceedings in the Fourth

---

[1] The Court will not address the remaining issues as they are rendered moot by the dismissal.
[2] Case No. 16-2018-DR-006555, Duval County Circuit Court (Doc. No. 97).

Judicial Circuit Court in and for Duval County, Florida (the "State Court"). Approximately two years later, on September 10, 2020, the State Court entered an Amended Final Judgment of Dissolution of Marriage (the "Divorce Judgment"). The Debtor argued in the State Court that the Rose Hill Property and a JP Morgan Chase ("Chase") account were his mother's property and not marital assets. In rejecting these arguments, the State Court found that although the Debtor could have easily provided documentation showing these assets belonged to his mother, he failed to produce any such evidence. Accordingly, the State Court determined that the Rose Hill Property and the Chase account were marital property subject to equitable distribution. Additionally, the State Court ordered the Debtor to pay $89,500 to Claimant as equitable distribution based on a value of $179,000 for the Rose Hill Property, which eventually sold for $270,000 on March 30, 2023. The State Court also ordered an equitable distribution payment to Claimant of $59,000 based on the Chase account value of $118,000. In conjunction with other miscellaneous items, the State Court ordered the Debtor to pay a total equitable distribution award to the Claimant of $152,476.30.[3] The Divorce Judgment made no equitable distribution allotment for the Waterloo Property because it was "schedule[d] to be sold in a foreclosure sale as neither party continued to make the monthly mortgage payments."[4]

The State Court also specifically found that:

i. The Debtor's "entire testimony regarding his finances is not credible."

ii. The Debtor "hid his true earnings from [Claimant] and is attempting to block [Claimant] from obtaining her marital share of assets."

iii. The Debtor falsely presents himself as financially unsophisticated despite evidence to the contrary.

---

[3] Creditor's Exhibit 9.
[4] Id.

    iv.    The Debtor "is either intentionally attempting to prevent [Claimant] from accessing marital assets or he [sic] assisting his mother in committing public assistance fraud."

    v.    The Debtor "intentionally divested himself" of certain assets. For instance, he liquidated a JP Morgan account worth $118,000 and transferred the funds to his mother immediately prior to filing for divorce.

    vi.    The Debtor's stated income did not align with the deposits on his bank statements.[5]

On December 1, 2020, after the Debtor failed to pay the equitable distribution award, the Claimant obtained a money judgment for $152,476.30 plus 5.37% interest (the "Money Judgment"). The Claimant recorded a non-certified copy of the Money Judgment in the Official Records of Duval County.[6]

On September 22, 2023, the Debtor filed for relief under Chapter 13 of the United States Bankruptcy Code. The Debtor's initial Chapter 13 plan proposed to pay unsecured creditors, including the Claimant, a total of *only* $150 over the five-year term of the Plan.[7]

On the Debtor's initial Schedule A/B filed on September 22, 2023,[8] he listed no cash, no cryptocurrency accounts, and no e-commerce accounts.[9] The *sole* bank accounts disclosed were a checking account and a savings account at Community First Credit Union. On November 6, 2023, the Debtor amended his Schedule C to claim the homestead exemption for the Waterloo Property.

---

[5] Id.
[6] Creditor's Exhibit 11.
[7] Doc. No. 4, p. 9 & 11.
[8] Doc. No. 1, pp. 10-15.
[9] Although the Debtor initially failed to list his rights in a 3M lawsuit, the Court finds the Debtor's testimony on this *sole* issue to be credible and deems that the omission is justified under the circumstances. Importantly, the Debtor informed his attorney about the 3M lawsuit at their initial meeting. However, because the case was filed on an emergency basis to cancel the pending foreclosure sale, the Debtor and his attorney inadvertently failed to disclose the 3M lawsuit in the initial schedules.

At the Meeting of Creditors held on November 6, 2023, the Chapter 13 Trustee questioned the Debtor regarding his financial affairs and the Debtor testified that he did not own any cryptocurrency. Specifically, the Chapter 13 Trustee inquired whether the Debtor had: "any **internet banking or e-commerce accounts**, like PayPal, **Cash App**, Venmo?"[10] The Debtor responded "no" and further testified that he did not own any cryptocurrency. Based upon the evidence presented at trial, the Debtor does in fact maintain a Cash App account, which he has used frequently for years and continues to use post-petition. The Debtor's Community First bank statements also indicate that he uses a PayPal account.[11]

During a 2004 Examination conducted by the Claimant in December of 2023,[12] the Debtor testified to having approximately $9,000 in cash,[13] and reiterated his prior testimony that he owns *no* cryptocurrency. He further testified that he held checking and savings accounts at Community First and Vystar, and that his Navy Federal Credit Union ("Navy FCU") bank accounts had been closed. Regarding his work as a handyman, the Debtor testified that he would receive $50 to $60 for installing blinds. In response to the request by Claimant's counsel for him to provide: "an example of a bigger project," the Debtor responded: "[t]hat's the biggest I can do. I can't do much."[14]

On December 12, 2023, the Debtor filed an Amended Schedule A/B but did not disclose any other bank or e-commerce accounts other than Community First CU accounts or list any cash.[15] On or about December 28, 2023, Claimant issued subpoenas to Navy FCU, Community First, and Vystar requesting the production of documents.[16]

---

[10] Creditor's Exhibit 8.
[11] Creditor's Exhibit 2, p. 161.
[12] Creditor's Exhibit 21.
[13] Id. at p. 53.
[14] Id. at p. 69.
[15] Doc. No. 45, p. 11.
[16] Doc. Nos. 55, 57. Creditor's Exhibits 2, 5-6.

On January 31, 2023, the Debtor filed a Second Amended Schedule A/B,[17] which again listed no cash, e-commerce accounts, or cryptocurrency holdings. For the first time, the Debtor listed *seven* additional checking and savings accounts that were not previously disclosed, including accounts at Vystar, Navy FCU, and Chase Bank. On February 13, 2024, Claimant filed a Motion to Dismiss Debtor's Case for Cause,[18] which specifically referenced the Debtor owning undisclosed cryptocurrency accounts with Coinbase and UpHold, as well as e-commerce accounts with Cash App, Zelle, and PayPal.

On February 21, 2024, the Debtor filed his Second Amended Chapter 13 Plan, which provided the *de-minimus* amount of $300 to unsecured creditors.[19] On the same day, he also filed a Third Amended Schedule A/B, which *finally* disclosed his cryptocurrency holdings at Coinbase and Uphold (which were referenced in the Claimant's Motion to Dismiss), however, he still failed to list cash or e-commerce accounts. The Debtor's failure to list cash directly contradicts his testimony that he had approximately $9,000 in cash.[20] Additionally, despite the Debtor's bank statements which reflect the Debtor's frequent use of cash, the Debtor curiously testified that he never receives cash for the jobs he does as a handyman.[21] Highlighting the unlikeliness of the Debtor's testimony is the fact that in 2022 and 2023, the Debtor withdrew close to $20,000 in cash from his Community First accounts. Additionally, the Debtor's bank statements show that he frequently deposits cash into his accounts, including a $500 cash deposit on November 18, 2023.[22]

---

[17] Doc. No. 68.
[18] Doc. 79.
[19] Doc. 85, p. 9 & 12.
[20] Creditor's Exhibit 21, p. 53.
[21] Id. at p. 73.
[22] Creditor's Exhibit 2, p. 166 (bank statements provided through December 31, 2023).

Through diligent investigation, the Claimant discovered *numerous* other undisclosed bank accounts held by the Debtor at Vystar Credit Union, Navy Federal Credit Union, Chase Bank, and cryptocurrency holdings with Coinbase and Uphold. Tellingly, the Debtor only amended his schedules to list these accounts, after the Claimant issued third-party subpoenas.[23] Upon review of the bank statements, which were introduced into evidence at trial, the Claimant discovered transfers to Uphold and Coinbase and subsequently issued subpoenas requesting documents from these brokerages. At the time of trial, the Claimant had not yet received responsive documents from Coinbase and Uphold.

Additionally, the omission of the Vystar accounts adds to a growing list of *material* non-disclosures by the Debtor.[24] First, the Vystar accounts were opened not long before the bankruptcy filing.[25] Second, the Vystar accounts were actively used by the Debtor since being opened. Third, the statements reflect numerous ATM withdrawals totaling $2,655 from July of 2023 to November of 2023. The ATM withdrawals reflect that the Debtor is either frequently traveling or allowing friends and family to withdraw money from his accounts.[26]

The eleventh-hour disclosure of the Debtor's Uphold account is also troubling.[27] The Uphold account had a value of $1,947.87 as of the Petition Date, and the Debtor made a $600 deposit to Uphold as recently as two months pre-petition.[28] Despite filing numerous amendments, the Debtor also failed to amend his schedules to disclose any cash or liquid funds held in Cash App, Square, Apple Cash, PayPal, or other similar accounts, he frequently used.

---

[23] Although the Debtor mentioned Vystar during the 2004 examination on December 6, 2023, he failed to amend his schedules to list Vystar until January 31, 2024. Creditor's Exhibit 21, pp. 46-47.
[24] The omission of the Navy FCU and Chase Bank accounts is not as concerning given that these accounts reflect little to no activity in the months preceding the bankruptcy.
[25] Creditor's Exhibit 6, p. 4 (Vystar accounts opened 5/1/23, 6/5/23, and 8/4/23).
[26] Creditor's Exhibit 6, pp. 20, 24 (e.g. - $102.50 ATM withdrawal in Bronx, NY; $716.40 ATM Withdrawal in Guyana).
[27] Doc. No. 84.
[28] Creditor's Exhibit 6, p. 22.

Regarding his income, the Debtor testified during his deposition that he would receive $50 to $60 to install blinds and that was the "biggest" project he is capable of performing.[29] The transaction history from Block, Inc., the parent company of Cash App, indicates this testimony cannot be accurate. For example, on November 18, 2023, the Debtor received $1,200 from AGS Electrical. This transaction alone, equates to *twenty* times more than the maximum amount the Debtor testified he would receive for a single project.

Additionally, on April 28, 2023, the Debtor received $1,000 from Maria Wallace as a "Final Payment,"[30] and the funds went directly to the Debtor's Cash App cash balance. The term, "final payment," indicates other payments for this project were made, and a review of the Community First bank statements reflects that the Debtor received an additional $4,500 from Maria Wallace in April of 2023.[31] These and other transactions reveal that the Debtor is either receiving income from undisclosed sources or that his testimony was grossly misleading as to the maximum amount of compensation he receives per handyman job.

In total, the Debtor appears to have received incoming transfers and deposits in 2023 of over $80,000 across his various accounts.[32] A *tremendous* amount more than his stated income as a handyman.[33] The litany of inaccuracies continues upon review of the Debtor's Statement of Financial Affairs, which reflects no payments to insiders in the year prior to the Petition Date.[34] However, the documentary evidence once again conflicts with the Debtor's sworn statements. Specifically, the bank statements reflect that in the year prior to filing, the Debtor sent payments to his mother via Zelle totaling $5,400.[35] The Debtor also continued to send

---

[29] Doc. No. 63-6, p. 68.
[30] Creditor's Exhibit 1.
[31] Creditor's Exhibit 2, pp. 108,
[32] This does not take into account the VA disability income he receives and inter account transfers.
[33] Creditor's Exhibits 1, 2, 6; Doc. No. 1, p. 38 (reflects $6,585 income for 2023 up to September 22, 2023).
[34] Doc. No. 1, p. 40.
[35] Creditor's Exhibit 2, pp. 62, 69, 71, 84-85, 102, 112, 14. Creditor's Exhibit 6, p

Zelle payments to his mother post-petition from his *undisclosed* Vystar account,[36] and received numerous incoming transfers from his sister, Tiffney Lamazon.[37]

Although Claimant questioned the Debtor at the Meeting of Creditors and at a 2004 Examination, she did not have a full and fair opportunity to question the Debtor before trial because of the Debtor's numerous non-disclosures and untimely disclosures. At trial, the Court heard testimony of the parties. Curiously, Claimant chose **not** to cross-examine the Debtor.

After considering the entire record, testimony proffered, and evidence presented, the Court makes the following observations:

- The Debtor has been less than forthright in his representations and actions pre-petition and post-petition.

- Given the Debtor's lack of transparency, the Court cannot possibly assess his true assets and income, except to conclude that his assets and income are materially greater than what he has disclosed.

- The Debtor has a history of a lack of candor with the judiciary.

- The Debtor's deceit is primarily geared at thwarting the rights of the Claimant, and he obfuscates his assets and income to avoid paying her claim. Despite the entry of the Final Judgment by the State Court, the Debtor candidly admits that he does not view her claims as legitimate.

## **Discussion**

Bankruptcy is for the honest but unfortunate debtor. Grogan v. Garner, 498 U.S. 279, 286, 111 S. Ct. 654, 659 (1991). Although the Debtor meets the unfortunate component; he fails the second prerequisite: honesty. A debtor who fails to take his obligations under the

---

[36] Creditor's Exhibit 6, pp. 37
[37] Creditor's Exhibits 1, 2, 6.

Bankruptcy Code seriously should not be eligible to benefit from the numerous protections provided by the Code.

Lack of good faith is sufficient cause for dismissal of a Chapter 13 case. In re Uzaldin, 418 B.R. 166, 174 (Bankr. E.D. Va. 2009) (citing 11 U.S.C. § 1307(c); In re Love, 957 F.2d 1350 (7th Cir. 1992)). See also Piazza v. Nueterra Healthcare Physical Therapy, LLC, 719 F.3d 1253, 1261 (pre-petition bad faith represents "cause" for dismissal under § 707(a)). Bad faith is not expressly stated as grounds for dismissal under § 1307. Rather, bad faith falls under the catch-all of "cause." 11 U.S.C. § 1307(c). To confirm a plan, good faith is an express requirement under § 1325(a)(3). In assessing bad faith, the Court looks at the totality of the circumstances. In re Blige, 2019 Bankr. LEXIS 2654 (Bankr. S.D. Ga. Aug. 21, 2019) (citing Kitchens v. Georgia R.R. Bank and Trust Co. (In re Kitchens), 702 F.2d 885, 888-89 (11th Cir. 1983).[38]

In evaluating the totality of the circumstances, one factor the Court considers is the Debtor's "sincerity in dealing with his creditors." In re Kitchens, 702 F.2d 885, 888 (11th Cir. 1983). The Debtor clearly did not respect the decision of the State Court or the Claimant's rights established under the Divorce Judgment and Money Judgment. The Court finds the Debtor's concerted efforts to thwart Claimant's rights, beginning with voluntarily divesting himself of assets for no consideration, are not merely insincere, but deceitful.

The Court also considers the de-minimis repayment proposed to pay unsecured creditors of a mere $300, an average of $5 per day. Based on the almost nonexistent distribution proposed, this factor weighs in favor of dismissal for bad faith.

---

[38] Although the Eleventh Circuit's analysis in Kitchens was considered under § 1325(a)(3) to determine good faith for confirmation of a Chapter 13 plan, the same good faith inquiry applies to a motion to dismiss for cause under § 1307. Staggs v. Kirk, 548 B.R. 597, 603 (Bankr. S.D. Ga. 2016).

Further, the Court considers the circumstances of how the Claim arose. Staggs v. Kirk, 548 B.R. 597, 603 (Bankr. S.D. Ga. 2016). In this regard, the Court finds a decision from the Bankruptcy Court for Eastern District of Virginia to be particularly instructive. In re Uzaldin, 418 B.R. 166, 174 (Bankr. E.D. Va. 2009). The facts in Uzaldin are remarkably similar to the instant case. There, the court found:

> The use of the bankruptcy process to avoid the equitable distribution award follows the debtor's pre-divorce pattern of divesting himself of marital property so as to stymie [the former spouse's] efforts to obtain an equitable distribution. The circuit court found the debtor to [sic] committed waste of the marital assets by transferring money to his mother during the period the parties' marriage was failing. The amounts transferred were significant. The debtor transferred his interest in the Leeds Castle Drive property to his mother for no consideration.

In re Uzaldin, 418 B.R. at 175.

Similarly, the State Court found that the Debtor purposely divested himself of assets to avoid paying equitable distribution to the Claimant. These transfers include the Rose Hill Property to his sisters and a Chase account to his mother. Notably, the value of these assets was significant. The Rose Hill Property, which was unencumbered, ultimately sold for $270,000, more than enough to satisfy the equitable distribution owed to Claimant.

After failing to pay the equitable distribution award, the State Court entered the Money Judgment. Importantly, the State Court made numerous findings regarding the Debtor's dishonesty,[39] including that he: (i) deceptively presented himself as financially unsophisticated; (ii) misrepresented his income; and (iii) may have assisted his mother in public assistance fraud.

The Debtor's unprincipled conduct continued after the divorce and throughout this bankruptcy case. Despite *numerous* schedule amendments, the Debtor never corrected all the

---

[39] Infra pp. 3-4.

errors and omissions. Rather than disclosing the material omissions when he amended his schedules, the Debtor waited until the Claimant uncovered the omissions through questioning at the Meeting of Creditors, 2004 Examination, and through third-party discovery. The Debtor's pattern of categorically denying the existence of material assets, until such assets were uncovered, is the height of deceptive behavior. The record reflects that the Debtor repeatedly displayed this deceitful behavior throughout his bankruptcy. In sum, the Debtor's bad faith conduct permeates the entire case. In re Kelley, 58 B.R. 927 (Bankr. D. Del. 1986).

The Debtor's assertion that no additional omissions have occurred, other than those belatedly disclosed at trial, rings hollow. The Debtor's unscrupulous behavior throughout the Case speaks volumes and has resulted in him squandering any benefit of the doubt that he may have otherwise received.

It is not incumbent on the Court to speculate further regarding misrepresentations made by the Debtor. The Debtor's documented lack of respect for the integrity of the bankruptcy process and his pattern of only disclosing material information once an omission has been uncovered is more than sufficient  See, e.g., In re Van Gompel, 632 B.R. 730, 736 (Bankr. S.C. 2021) (finding bad faith based on numerous inaccuracies and omissions coupled with late disclosures made by the debtor only after he was repeatedly pressured to take his obligations seriously).

The Court understands the occurrence of errors and omissions, particularly when a case is filed on an emergency basis. However, the magnitude of "errors" in this case, coupled with the Debtor's unscrupulous pre-petition and post-petition behavior, are far too great to ignore. Therefore, the Court finds that the Debtor's documented pattern of misconduct, geared to thwart

the efforts of Claimant, warrants dismissal of the Case for bad faith.  See In re Uzaldin, 418 B.R. at 175.

## **CONCLUSION**

To receive the benefits of the bankruptcy process, a debtor is required to play by the rules, and a key component of that encompasses full and honest disclosure.  The Debtor has demonstrated a lengthy pattern of bad faith by divesting himself of assets, refusing to recognize the legitimacy of the State Court's rulings, and obfuscating assets and income to avoid paying the Money Judgment.  It appears that the Debtor has attempted to justify his actions based on his belief that the equitable distribution award levied by the State Court is neither fair nor just.  The bankruptcy court, however, does not sit in an appellate capacity over the State Court.  The State Court's ruling that these assets constitute marital property is *final*.  Instead of accepting and complying with the State Court's ruling, the Debtor deemed himself above the rule of law, refused to pay the equitable distribution award, and moreover, divested himself of assets.  The Debtor voluntarily took all these unscrupulous actions, both pre-petition and post-petition, despite readily having the funds to satisfy the Money Judgment.  In many instances, the Court is faced with very difficult decisions.  The Debtor's actions in this Case, however, have made it abundantly clear that the Debtor should not receive the benefits reserved for the honest but unfortunate debtor.

Accordingly, the Court will dismiss the Case.  A separate order consistent with these Findings of Fact and Conclusions of Law will be entered.